IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

DEE W. PHILLIPS,

    Plaintiff,

v.                                              Civil Action No.  3:04-0944

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Dee W. Phillips appeals the Social Security Commissioner's (hereinafter "Commissioner") final decision denying her applications for disability insurance benefits (hereinafter "DIB") and for supplemental security income (hereinafter "SSI") based on disability, brought under 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

**I**

The plaintiff filed her applications for DIB and SSI on March 21, 2002, alleging disability commencing October 24, 2000, as a consequence of a closed head injury and pain in her right breast and lower back.  Both applications were denied initially and again upon reconsideration.  At her request, an administrative hearing was held on June 23, 2003.  On September 23, 2003, an administrative law judge (hereinafter "ALJ") found that the plaintiff was not disabled, and his decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review.  Thereafter, the plaintiff filed this action seeking

review of the Commissioner's decision.

At the time of the ALJ's decision, the plaintiff was fifty-three years of age, had obtained an associates degree from Marshall University and had work experience as a sales associate, private duty care provider and bookkeeper. In his decision, the ALJ determined from the objective medical evidence that the plaintiff suffered from the following "severe" impairments[1] as defined by the social security regulations: "residual cognitive disorder following a closed head injury, vision problems, diabetes mellitus, depression, and anxiety." (R. 22.) He also determined that the plaintiff did not have an impairment or impairments which in combination satisfied or equaled any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. He further determined that the plaintiff had the following residual functional capacity (hereinafter "RFC"): "The claimant has the residual functional capacity to perform sedentary exertion that does not involve complex job tasks." (R. 23.) On the basis of this determination and plaintiff's age, education, and employment background, and relying on Rule 201.11 of the medical-vocational guidelines[2] and the testimony of a vocational expert (hereinafter "VE"), the ALJ found her not disabled.

Additional facts will be introduced as they relate to plaintiff's arguments for relief.

## II

Under the Social Security Act (hereinafter "Act"), the Court is required to uphold the Commissioner's decision if the decision is supported by substantial evidence and adheres to

---

[1] A medically determinable impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activity. 20 C.F.R. §§ 404.1521(a) and 416.921(a).

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 2, Tbl. 1.

proper legal standards. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987); *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner or his ALJ, *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), and "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner or his ALJ]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). Accordingly, the issues before the Court are whether the ALJ's decision is supported by substantial evidence that plaintiff is not disabled within the meaning of the Act and whether the decision is based on the correct application of the relevant law. *Coffman*, 829 F.2d at 517.

    According to the Act, an individual is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.A. §§ 423(d)(1)(A), 1382c(a)(3)(A) (West Supp. 2000). The Commissioner has developed a five-step procedure for making this determination. The first step requires consideration of whether the claimant is engaged in substantial gainful activity. If so, the claimant is found not disabled. If not, the second step requires a finding of whether there is a "severe" impairment. If not, the claimant is found not

disabled. If so, the third step calls for an analysis of whether the impairment(s) meets or equals one contained in the listing of impairments.[3] If so, the claimant is found disabled without further analysis. If not, the process continues to the fourth step where it is determined whether the claimant's impairment(s) prevents the performance of his or her past relevant work. If not, the claimant is found not disabled. If so, the burden of production shifts to the Commissioner for the final step.[4] In the fifth step, the Commissioner must demonstrate that the claimant can do other work. If the Commissioner satisfies this burden, benefits are denied. Otherwise, the claimant is found disabled, and benefits are awarded. 20 C.F.R. §§ 404.1520, 416.920.

In the case *sub judice*, both parties agree that the plaintiff has not engaged in any substantial gainful activity since her alleged onset date; she has severe impairments; she does not have an impairment or combination of impairments that satisfies a listing in Appendix 1, Subpart P, Regulation No. 4; and, she is unable perform her past relevant work. They disagree, however, on whether her impairments prevent her from performing any work. Hence, the plaintiff has appealed to this Court and seeks to have the Commissioner's decision reversed.

### III

The plaintiff has submitted three grounds in support of her motion for judgment on the pleadings. She alleges that the ALJ failed to include all of her impairments in the hypothetical to the VE, that the ALJ erred in finding that she has transferable skills and that the ALJ failed to adopt the limitations outlined in the evaluation completed by James F. Phifer, Ph.D. The

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[4] *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981); *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Commissioner, on the other hand, contends that the ALJ's decision is supported by substantial evidence and adheres to the law.  The Court will address plaintiff's grounds for judgment on the pleadings seriatim.

## A

Plaintiff's first argument for relief is that the ALJ failed to include in the hypothetical to the VE the restriction that she was limited to employment that did not include complex job tasks.

The Fourth Circuit has held that a vocational expert's opinion is of value only if given in response to "proper hypothetical questions which fairly set out all of [a] claimant's impairments."  *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

In the case *sub judice*, the ALJ propounded the following hypothetical to the VE:

> I want you to assume that I would find that the claimant had the residual functional capacity to perform sedentary work activity.  She's classified during the period of time under consideration closely approaching advanced age.  She has a high school plus education.  In the past has performed semiskilled work.  Plus has transferable skills to some jobs, and under the applicable rule and regulations would be found not disabled.  In addition, however, I want you to assume that I find the claimant has non exertional impairments, specifically pain in various body areas, notably pain in the area of the low back, neck and legs.  She has verbal IQ of 86, performance IQ of 84, full scale IQ of 84.  She, due to an accident, she has some cognitive impairment and memory lapse.  She also has some drowsiness and dizziness due to her medication.  Now assume on the one hand that I would find that the none [sic] exertional impairments would exist and occur with such frequency and severity so as to preclude sustained physical and mental activities on her part.  On the other hand, I assume that I would find that they would be in the mild to moderate nature and not as severe as I have just described to you.  Now in light of that criterion, that alternative, can she do any of the jobs indicated in the regulations?

(R. 298-99.)

Contrary to the plaintiff's assertion, the above hypothetical question does include the limitation at issue.  Specifically, when the ALJ included the plaintiff's IQ scores as well as some

mild to moderate cognitive impairment and memory lapse, the ALJ was restricting the plaintiff to employment that did not require complex job tasks. As the ALJ's hypothetical question fairly sets out all of plaintiff's impairments, the Court rejects this argument for relief.

**B**

Next, the plaintiff argues that the ALJ erred in finding that she has transferable skills. Specifically, the skills "that she had that she acquired as a sales attendant would be people skills, some record keeping, but not much, talking to customers, assisting people with making selections, those kinds of things." (R. 301.)

In the case *sub judice*, the plaintiff underwent psychological and neuropsychological examinations. Neither of these evaluations indicates that the plaintiff has lost her ability to talk to people. In fact, Kelly Rush, M.A. found that she acted appropriately and related fairly well during the interview. Robert P. Granacher, Jr., M.D. of the Lexington Forensic Institute found:

> Mrs. Phillips was friendly and cooperative and seemed to have a good attitude towards the testing process. Her speech was coherent and there was no evidence of significant language deficits. She made good eye contact and spoke spontaneously. Rapport was established and maintained. She frequently smiled and used humor during the evaluation. Overall, she appeared to be reasonably comfortable within the testing environment.

(R. 235.) In addition, subsequent to her accident she was able to earn her associates degree from Marshall University. Moreover, she reported to Ms. Rush that she was able to pay her bills, play on the computer, read, shop and drive herself to places unaccompanied. Given this evidence, the Court holds that substantial evidence supports the ALJ's finding that the plaintiff retains her people skills and some record keeping abilities.

**C**

Next, the plaintiff argues that the ALJ failed to adopt the limitations outlined in Dr.

Phifer's evaluation. With regard to plaintiff's ability to work, Dr. Phifer's provided the following opinion:

> With regard to her ability to manage job demands, given her persisting postconcussive symptoms, Ms. Green would be restricted to work that permits flexible hours and frequent rest breaks and a quiet work environment with minimal distractions. Given her current status, she would need to avoid work that involves frequent change of procedure or multiple simultaneous mental demands.

(R. 145-46.) The plaintiff further argues that the evaluations from William Given, M.A., Psychologist and Dr. Granacher are consistent with Dr. Phifer's opinion.

The disability decision is reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Moreover, an ALJ's determination as to the weight to be assigned to a medical opinion cannot be disturbed without some indication that the ALJ has "dredged up specious inconsistencies" or has failed to provide a good reason for the weight afforded a particular opinion. *Scivally v. Sullivan*, 966 F.2d 1070, 1076-77 (7th Cir. 1992), *see also* 20 C.F.R. §§ 404.1527(d), 416.927(d). In *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992), the Fourth Circuit affirmed that a treating physician's opinion on the issue of disability is not controlling. In *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996), the court stated that the regulations give a treating doctor's opinion controlling weight with respect to the nature and severity of the impairment if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. The court further stated: "[B]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.*

When a treating doctor's opinion is not given controlling weight, however, the following

factors should be used to determine the opinion's weight. First, the more evidence the physician presents to support his opinion, particularly medical signs and laboratory findings, the more weight is given to the opinion. Well-reasoned explanations are also given more weight,[5] and the more consistent a treating doctor's opinion is with the record as a whole the more weight afforded to his opinion.[6] Finally, a specialist's opinion will be given more weight than that from a nonspecialist.[7]

While Dr. Phifer's evaluation is lengthy, the crux of it is that the plaintiff suffers from a mild impairment of attention/concentration and a moderate decline in her speed of mental processing. The Court also notes the following from Dr. Phifer's opinion:

> On the **Pain Presentation Inventory**, Ms. Greene's T scores indicate the presence of a marked prominent contribution of nonorganic factors to her pain report and/or behavior.[8] Compared to other pain patients, Ms. Greene's generalized pain intensity level is significantly high. There is very poor agreement between her pain behavior and report of present pain, and she appears to mislabel a high number of non-pain symptoms as being somatic pain. Ms. Greene appears to report an exceptionally high number of atypical somatic symptoms. While this does not alter the above statements, Ms. Greene does not appear to systematically minimize or maximize her pain symptoms report.
>
> With regard to his [sic] general symptoms report, this client's generalized pain intensity level is quite high, even for a chronic pain population. As such, caution is recommended in interpreting this client's pain complaints. This client's generalized pain intensity level is comprised of a low level momentary pain behavior during the last month, a high level of least pain experienced during the last month, and a high level of present pain experienced during the exam.
>
> This client reports very little variability between worst and least pain.

---

[5] 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

[6] 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4).

[7] 20 C.F.R.§§ 404.1527(d)(5), 416.927(d)(5).

[8] Dr. Phifer's reference to Ms. Greene refers to the plaintiff.

Such lack of variability is highly unusual. As such, the examiner should exercise caution in accepting the pain report. In addition, it is noted that there is a marked discrepancy between the client's behavioral manifestation of pain and the client's verbal report of pain. Specifically, this client reports much more pain than she displays.

With regard to peak pain experiences, this client reports an extreme number and/or frequency of atypical somatic symptoms during peak pain experiences. Unless conscious deception or exaggeration is identified, such symptom report should be further explored by systematic interview. An examination of Pain Symptom Checklist item responses may be most helpful in conducting an appropriately structured interview designed to elicit additional information of note.

Of note, this client's report of experienced symptoms during peak pain experiences is quite inconsistent. First, there are very few somatic, emotional, behavioral, cognitive, and interpersonal symptoms of distress which the client never experiences during peak pain experiences. Second, and of perhaps more significance, there are few, if any, somatic symptoms which are consistently present during peak pain experiences. In short, this client's reported peak pain experiences are neither clearly defined by the consistent absence of certain symptoms, nor the invariable presence of other symptoms. Inconsistency is the only defining variable.

As has been shown by Fordyce and others, chronic pain patients frequently blur the boundaries between pain and suffering. In other words, they tend to confuse actual somatic pain with the psychosocial context in which it occurs or to which it leads. Such confusion is noted in this client's test results. An analysis of the Pain Symptom Checklist responses suggests that the following symptoms are mislabeled as being pain: 1) symptoms of memory, concentration, and cognitive dysfunction, 2) sleep disturbance, as typified by initial and/or middle insomnia, 3) symptoms such as fatigue, tiredness, weakness, and lack of energy, 4) dizziness, loss of balance, tinnitus, and/or lightheadedness, and 5) symptoms of anxiety and fear.

Compared to other chronic pain patients, this client's peak pain experiences are characterized by more frequent than expected symptoms of the following types: 1) symptoms of memory, concentration, and cognitive dysfunction, 2) dizziness, loss of balance, tinnitus, and/or lightheadedness, and 3) symptoms of anxiety and fear.

With regard to diagnostic considerations, it would appear that this client's pain experience is being consciously and intentionally exaggerated. Based upon the interrelationship of pain behavior and the verbal report of pain in 395 chronic

> pain patients, it is estimated that 81% of this patient's pain report appears to be consciously exaggerated (i.e., is in excess of that predicted on the basis of her overt pain behavior). The motivation underlying this client's pain experience or report appears to be significantly and adversely affected by issues regarding compensation and/or retribution.

(R. 140-41 (footnote added).)

As part of an occupational disability assessment, Mr. Given administered a number of tests. Mr. Given found that there were long delays before the plaintiff responded, suggesting concentration problems. He further found:

> The WASI provided a Full Scale IQ of 88 Verbal of 87 and a Performance IQ of 92.
>
> The Wide Range Achievement Test provided a reading level at 8.8 grade and math level at 7.2 grade.
>
> The Woodcock Johnson Passage Comprehension provided a standard score of 94 with a reading comprehension at the 7.7 grade.
>
> Testing supports low average-to-average intellectual functioning. Test results indicate it would be very difficult for Ms [sic] Greene/Phillips to complete any type of formalized training. Ms. Greene/Phillips has obviously lost abilities that she previously had including aptitudes.

(R. 112-13.)

On January 27, 2003, the plaintiff was evaluated by Dr. Granacher, who concluded the following:

> My neuropsychological evaluation, within the context of my overall examination, reveals impairment in the areas of visual attention, cognitive set shifting mental processing speed, and dominant manual dexterity. There is evidence to suggest that mental processing speed abilities have declined from a previous level of function. Since her cognitive effort was exceptional, these appear to be valid indicators of diminished cognitive capacity.

(R. 250.) With regard to her daily activities, the plaintiff reported to Dr. Granacher the following:

>Ms. Greene-Phillips retires about 11:00 p.m. and then awakens early at 3:00 a.m. to 4:00 a.m. She drives her vehicle in the city. She is able to attend church. She denies any current hobbies.
>
>She is able to read and write. She can watch television. She does no significant work otherwise. She is not employed, and she does not attend ball games, or hunt or fish. She eats outside the home socially three or four times a month. She can use a telephone, and she can dress and bathe herself independently.

(R. 230-31.) The Court notes that the plaintiff completed a 22-page medical questionnaire before the evaluation for Dr. Granacher and that he opined that she was able to continue with sitting for elderly people.

The record also includes an evaluation by Ms. Rush, dated June 18, 2002. After examining the plaintiff, Ms. Rush diagnosed Cognitive Disorder, NOS. Ms. Rush provided the following rationale for her diagnosis:

>Mrs. Phillips was given the diagnosis of Cognitive Disorder, NOS based on the following criteria: a cognitive disorder characterized by cognitive dysfunction presumed to be the direct physiological effect of a general medical condition that does not meet criteria for any of the specific deliriums, dementia or amnestic disorders listed.

(R. 168.) With regard to her daily activities, the plaintiff reported the following:

>Mrs. Phillips goes to bed at 2:00 am and gets up at 3:00 am. She gets up, vacuums, mops, picks up trash out of the yard, does the laundry, eats breakfast, feeds the cats, watches tv, takes a nap, takes a shower, gets dressed, goes to the post office, goes to visit a friend, eats, talks with her sister on the phone, eats, goes outside, rides around in her car, talks to her husband on the phone, reads, plays on the computer and goes to bed.

(R. 168.) With regard to her weekly activities, she reported to Ms. Rush that she goes to the grocery store and visits her husband. With regard to her monthly activities, she reported that she pays her bills and goes out to eat. She also reported that sewing was her hobby. With regard to her social functioning, she reported that had a fair relationship with her husband, had a few

friends and visited a few places. With regard to her concentration, Ms. Rush found that her attention and concentration were good. Ms. Rush also found that she was persistent and that her pace was normal.

The record also contains two psychiatric assessments by Samuel Goots, Ph.D and Frank D. Roman, Ed.D., dated July 10, 2002 and September 27, 2002, respectively. After reviewing the medical evidence in the record at the time of his assessment, Dr. Goots determined that the plaintiff had a cognitive disorder and that this disorder caused mild restrictions in her activities of daily living, social functioning, concentration, persistence and pace. He also determined that she had not had an episode of decompensation. Mr. Franks confirmed the assessment of Dr. Goots.

While Dr. Phifer's opinion is well-reasoned and supported by test results, it is inconsistent with the other medical evidence in the record as well as plaintiff's daily functioning. Specifically, Ms. Rush found after examining the plaintiff that her concentration was good and her pace was normal. Dr. Goots and Mr. Roman opined that plaintiff's cognitive disorder had a mild effect on her activities of daily living, social functioning, concentration, persistence and pace. Moreover, the Court notes that plaintiff was able to earn her associates degree from Marshall University subsequent to her head injury from a car accident - contrary to Mr. Given's opinion that it would be difficult for her to complete formalized training - and that her daily activities are consistent with the demands of working as a sales attendant, telemarketer and cashier.

Moreover, it appears to the Court that Dr. Phifer's opinion is somewhat internally inconsistent. On the one hand, Dr. Phifer has administered a number of tests supporting his

opinion that the plaintiff has problems with concentration and processing speed. On the other hand, Dr. Phifer states that she consciously and intentionally exaggerates her pain and that her pain symptoms are characterized by memory, concentration and cognitive dysfunction as well as dizziness, lightheadedness, anxiety and fear. Given the internal inconsistency within Dr. Phifer's opinion, and as the other medical evidence in the record does not corroborate Dr. Phifer's opinion, the Court holds that there is substantial evidence in the record to support the ALJ's decision not to adopt the limitations outlined in the conclusion of Dr. Phifer's opinion. Finally, the Court notes that the ALJ did not ignore Dr. Phifer's opinion or the plaintiff's complaints because he did restrict the plaintiff from performing work involving complex job tasks.

## IV

On the basis of the foregoing, it is **ORDERED** that the plaintiff's motion for judgment on the pleadings be **DENIED**, that the Commissioner's motion for judgment on the pleadings be granted and the Commissioner's decision be **AFFIRMED**. All matters in this case being concluded, it is **ORDERED** dismissed and retired from the Court's docket.

The Clerk is directed to mail a copy of this Memorandum Opinion and Order to all counsel of record.

ENTER: September 26, 2005

_____
ROBERT J. STAKER
SENIOR UNITED STATES DISTRICT JUDGE